[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-10987

_____

In Re: JUDITH LACY BOZEMAN,

                                                                    Debtor.

_____

MORTGAGE CORPORATION OF THE SOUTH,

                                                      Plaintiff-Appellant,

*versus*

JUDITH LACY BOZEMAN,

                                                      Defendant-Appellee,

SABRINA L. MCKINNEY,

                                                      Interested Party-Appellee.

————————————

Appeal from the United States District Court
for the Middle District of Alabama
D.C. Docket Nos. 2:20-cv-00403-RAH,
Bkcy No. 2:16-bk-32469-WRS

————————————

Before Rosenbaum and Tjoflat, Circuit Judges, and Moody,[*] District Judge.

Rosenbaum, Circuit Judge:

Section 1322(b)(2) of Title 11 is known as the Bankruptcy Code's "antimodification" provision. *Tanner v. FirstPlus Fin., Inc.,* (*In re Tanner*), 217 F.3d 1357, 1359 (11th Cir. 2000). Under it, without the lender's express approval or an applicable statutory exception, bankruptcy plans cannot modify the rights of home-mortgage lenders as they relate to mortgages on a debtor's principal residence secured by that residence.

Despite the antimodification provision, Debtor-Appellee Judith Lacy Bozeman's confirmed bankruptcy plan purported to modify the rights of Plaintiff-Appellant Creditor Mortgage Corporation of the South's ("MCS") mortgage on Bozeman's residence. In fact, her plan purported to eradicate all remaining

———————————————

[*] The Honorable James S. Moody, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

outstanding payments on her mortgage, beyond MCS's claims for past-due arrearages. Then, after Bozeman paid off the debts identified under her bankruptcy plan, Bozeman sought to have MCS's lien on her home (which had guaranteed her payments on the outstanding loan balance) dissolved. Noting that the bankruptcy court had confirmed Bozeman's Plan without objection and that 11 U.S.C. § 1327 (the "finality" provision) renders confirmed plans final, the bankruptcy court granted Bozeman's motion, and the district court affirmed.

This case requires us to determine which provision wins—antimodification or finality—when the two clash in the scenario this case presents. We declare the antimodification provision the victor.

Under Supreme Court and Eleventh Circuit precedent, we read the antimodification provision as an ironclad "do not touch" instruction for the rights of holders of homestead mortgages. So a bankruptcy plan cannot modify the rights of a mortgage lender whose claim is secured by the debtor's principal residence by providing for release[1] of the homestead-mortgagee's lien before the mortgagee has recovered the full amount it is owed. For this reason, we reverse the bankruptcy court's order discharging MCS's lien on Bozeman's home and the district court's order affirming it.

_____

[1] A "release" of a lien "discharge[s] a [lien] upon full payment by the borrower" and "show[s] that the borrower has full equity in the property." *Release of Mortgage*, Black's Law Dictionary (11th ed. 2019).

## I.

In 2015, Judith Bozeman mortgaged her home to MCS for a $14,000 loan. In exchange for the mortgage loan, Bozeman agreed to pay MCS back, plus 19.7% annual interest, over nine years. And as collateral, Bozeman agreed to give MCS a security interest in her home. That allowed MCS to foreclose on Bozeman's home and recoup the balance of Bozeman's debt to MCS if Bozeman failed to pay back the money she borrowed.

Unfortunately, in 2016, Bozeman's financial situation took a turn for the worse. On September 7, she filed for Chapter 13 bank-ruptcy—a legal action that allows an income-earning debtor to hold onto her property while she pays her creditors back over a three-to-five-year period. *Harris v. Viegelahn*, 575 U.S. 510, 514 (2015) (citing 11 U.S.C. §§ 1306(b), 1322, 1327(b)).

A week after Bozeman filed for bankruptcy, on September 16, MCS filed a proof of claim.[2] *See* 11 U.S.C. § 501. In that proof of claim, MCS asserted Bozeman owed $6,817.42 in arrears on the 2015 mortgage loan.[3] The proof of claim listed the value of MCS's claim several times, each time with "Arrearage only" handwritten beside it. In other words, the proof of claim did not include the

---

[2] A proof of claim is a legal form a creditor fills out to make a claim for pay-ment out of bankruptcy funds in a bankruptcy case. *See* Bankruptcy Form 410.

[3] "Arrears" refer to "unpaid or overdue debt[s]." *Arrear*, Black's Law Dictionary (11th ed. 2019)

amount outstanding on Bozeman's loan after payment of the arrearages.

A few days after MCS filed its claim, Bozeman filed a proposed payment plan. And two months later, Bozeman filed an amended plan (for convenience, our further reference in this opinion to the amended plan uses the term "Plan").[4] In the Plan, Bozeman acknowledged a debt to MCS, secured by her home, in the amount of $17,393.04, plus 7.568% in interest. She also listed a secured car loan and unspecified unsecured debt, each owed to unrelated creditors. Bozeman's Plan proposed 58 monthly payments of $503.00 to the bankruptcy Trustee, $454.00 of which would go to MCS (seemingly adding up to a total of $26,332.00 (58 months x $454.00 per monthly payment) for MCS).

Bozeman's Plan included a lien-retention provision that guaranteed secured creditors' retention of their liens until

---

[4] When someone files a Chapter 13 bankruptcy petition, a disinterested trustee is appointed to administer the case. 11 U.S.C. § 1302. Among other things, the trustee evaluates the case, collects payments from the debtor, and distributes those payments to the creditors. *Id.* § 1302(b). On November 17, the trustee here ("Trustee") filed an objection to confirmation of the initial plan. Among other reasons, the Trustee objected because the proposed plan did not satisfy the required commitment period (the period for which the plan provides for a debtor to make payments). To justify a shorter commitment period, the Trustee requested that Bozeman include full payments to all unsecured creditors through the plan. *Id. See* 11 U.S.C. § 1325(b)(4). Bozeman then filed her amended Plan, which included 100% payments to her unsecured creditors.

"completion of all payments under [the] [P]lan." Still, though, Bozeman's Plan advised that "[c]reditors must file a proof of claim to be paid." And it expressly proposed that once her Plan was confirmed, "the creditor's claim shall be paid its specified monthly [P]lan payments on the terms and conditions" provided for by the [P]lan "as required under § 1325(a)(5)."[5]

The form on which Bozeman submitted her Plan identified several possible ways she could pay her creditors. Among others, one provision was titled, "curing defaults" under § 1322(b)(5). This avenue would have allowed Bozeman to remedy debts for which she had fallen behind. A plan that uses this mechanism, known as a cure-and-maintain plan, allows a homeowner "to stave off foreclosure and catch up [her] mortgage within a reasonable amount of time." *In re Muhammad*, 536 B.R. 469, 471 n.1 (Bankr. M.D. Ala. 2015) (citing 11 U.S.C. § 1322(b)(5)). It is designed to remedy arrearages when the full balance of the debt will become due *after* the Chapter 13 plan ends. Though MCS's loan to Bozeman—with its $6,817.42 in arrearages and its balance due after the Plan ended—would have fit the bill for the "curing defaults" provision, Bozeman did not list any debts under that section.

Rather, she provided for her debt to MCS under the section titled, "secured claims paid through the [P]lan." This provision

---

[5] Section 1325(a)(5) outlines requirements for Chapter 13 plans that provide for the payment of secured claims.

advised that creditors' claims were to be paid under "the terms and conditions listed below as required under § 1325(a)(5)."

The bankruptcy court later described Bozeman's Plan as a full-payment plan, meaning that (unlike a cure-and-maintain plan) it provided for payment of the full balance of the identified debts within the life of the Chapter 13 plan.[6] Put simply, under a full-payment plan, Bozeman's entire debt to MCS (including both the arrearages and any remaining balance) would be considered fully paid when Bozeman completed payments on her Plan.

MCS did not object to Bozeman's Plan. Nor did it initially file an amended claim.[7]

On January 9, 2017, the bankruptcy court held a confirmation hearing. The Trustee filed a summary of the confirmed Plan. That summary reiterated that Bozeman would make 58 monthly payments of $503.00 to the Trustee. And it listed MCS as the only secured creditor. In addition, the summary identified the value of the collateral supporting MCS's claim as $17,180.00, with an interest rate of 7.57%, and monthly payments of $454.00. The Trustee

---

[6] The district court referred to this type of plan as a full-balance plan. These terms are interchangeable, so for the sake of simplicity, we use the term "full-payment plan."

[7] In May 2019, two-and-a-half years after MCS filed its initial claim, MCS filed two amended proofs of claim. The bankruptcy court rejected those claims as untimely filed. MCS has not appealed that decision.

transmitted a copy of the Plan to MCS, and on January 14, 2017, the bankruptcy court confirmed the Plan.

Just over a year later, in March 2018, MCS moved to dismiss the bankruptcy proceeding because Bozeman fell behind on her Plan payments. MCS and Bozeman negotiated a resolution, and MCS withdrew its motion to dismiss.

With the Plan back on track, a little more than a year later, on May 13, 2019, the Trustee filed notice that Bozeman had completed her payments under her Plan. The "Notice of Final Cure Payment" said that Bozeman had successfully paid $6,817.42 to the Trustee under the Plan. According to the Trustee, this figure constituted the "[e]ntire mortgage debt" owed MCS. So the Notice of Final Cure Payment declared that Bozeman had paid her "prepetition arrearage" balance of $6,817.42 in full and that she had no remaining payments under the Plan.

The next day, MCS objected. Although Bozeman had paid the full amount "required to cure the default on the arrearage claim," MCS explained, she had paid nothing towards the remaining $15,032.73 balance due on her mortgage. So on June 12, MCS moved to lift the automatic stay on enforcement proceedings so it could seek to foreclose on Bozeman's home.[8]

---

[8] When a bankruptcy case is filed, other litigation against the debtor is automatically stayed. *See* 11 U.S.C. § 362.

Three months later, on September 12, 2019, Bozeman moved to release the lien MCS held on her property. She argued that at the outset of the bankruptcy proceeding, she proposed to pay her entire debt to MCS. And, she continued, she had paid MCS everything it had asked for in its original proof of claim. Having paid MCS's original claim, Bozeman asserted, she satisfied the lien MCS held against her property, so the court should treat the lien as satisfied and released.

MCS objected to Bozeman's motion to discharge the bankruptcy and release the lien. It raised a series of arguments.

First, MCS contended that Bozeman had not complied with the straightforward terms of the Plan. The Plan acknowledged a $17,180.00 debt and required 58 consecutive payments. That debt had not been paid, and not all 58 payments had been made.

Second, MCS asserted that the Plan was illegal at the outset. Under the antimodification provision, MCS argued, a plan cannot modify the rights of a holder of "a claim secured only by a security interest in real property that is the debtor's principal residence." That, MCS asserted, described its lien here. So, MCS reasoned, the bankruptcy court was not free to modify the terms of its mortgage claim by approving Bozeman's Plan to the extent that it purported to extinguish the mortgage five years short of its maturity date and "cram[] down the interest rate."

Relatedly, MCS noted that 11 U.S.C. § 1322(c)(2) excuses compliance with the antimodification provision when "the last

payment on the original payment schedule for a claim [that is secured only by a security interest in real property that is the debtor's principal residence but that] is due *before* the date on which the final payment under the plan is due." (emphasis added). But, MCS argued, that provision did not except MCS's claim from the anti-modification provision because, under the original payment schedule for Bozeman's mortgage, the last payment was due three years *after* the Plan was scheduled to be completed.

Third, MCS contended that longstanding principles of bankruptcy law prohibit invalidation of a secured lien through bankruptcy. As MCS saw things, a lien, particularly a mortgage lien, "survives" a confirmed Chapter 13 plan, and the general rule is that liens "pass through" bankruptcy unaffected. According to MCS, bankruptcy can extinguish an *in personam* claim against a debtor, but it does not eliminate an *in rem* claim against the debtor's property.

Finally, MCS argued that our decision in *In re Bateman* squarely controlled the case. There, we held that "a secured creditor's claim for mortgage arrearage survives the confirmed plan to the extent it is not satisfied in full by payments under the plan, or otherwise satisfied." *Universal Am. Mortg. Co. v. Bateman* (*In re Bateman*), 331 F.3d 821, 822 (11th Cir. 2003). Were that not the case, we explained, we "would deny the effect of 11 U.S.C. § 1322(b)(2), which, in effect, prohibits modifications of secured claims for mortgages on a debtor's principal residence." *Id.*

In response, Bozeman made four primary points.

First, she said that MCS got what it had bargained for. As Bozeman saw things, MCS had asked for $6,817.42 plus interest, and that's exactly what it received. Bozeman pointed out that MCS could have amended its claim before the claim submission deadline, but it failed to do so. Nor did it offer any "excuse either for its initial failure or for sleeping on its rights until the Plan had concluded," Bozeman asserted.

Second, Bozeman argued she would be unfairly prejudiced if the bankruptcy court did not discharge her debt to MCS. This was so, Bozeman explained, because Bozeman had to pay her unsecured creditors in full with what was left after she paid the arrearages claim, since MCS had failed "to amend its proof of claim to accurately represent what was owed . . . ."

Third, Bozeman acknowledged the discrepancy between the debt she outlined in her plan (the $17,180.00, with an interest rate of 7.57%) and the debt MCS claimed in its proof of claim ($6,817.42). But in her view, MCS's smaller claim superseded the Plan's estimation of the amount of her debt to MCS.

And fourth, Bozeman argued that the Supreme Court's decision in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010), foreclosed MCS's challenge to the Plan based on the alleged improper confirmation of the Plan. To the extent this Court's decision in *Bateman* conflicted with *Espinosa*, Bozeman suggested that *Espinosa* controlled.

Following an evidentiary hearing, the bankruptcy court granted Bozeman's motions to discharge her from bankruptcy and to deem MCS's lien satisfied.  MCS filed a notice of appeal with the district court.  In that notice (and later in its briefing before us), MCS limited its appeal to the bankruptcy court's decision to deem the lien satisfied.  The district court affirmed.

We now consider MCS's appeal.

## II.

We "sit[] as a second court of review." *Yerian v. Webber* (*In re Yerian*), 927 F.3d 1223, 1227 (11th Cir. 2019) (quotation omitted).  In that role, we "examine[] independently the factual and legal determinations of the bankruptcy court and employ[] the same standards of review as the district court." *Id.*  When, as here, the district court affirms the bankruptcy court's order, we review the bankruptcy court's decision. *Brown v. Gore* (*In re Brown*), 742 F.3d 1309, 1315 (11th Cir. 2014)  In so doing, we review the bankruptcy court's legal conclusions de novo and its factual findings for clear error. *Id.*

## III.

The only question we address in this appeal is whether Bozeman's payoff of her Plan entitled her to satisfaction of MCS's lien on her home.  Our prior precedent requires us to conclude it did not.  We divide our analysis into two parts.  In Section A, we explain why the Plan modified MCS's rights in violation of the Bankruptcy Code's antimodification provision, so our precedent

requires us to conclude the Plan was not a legal one. Section B shows why, despite the preclusive effect of the confirmed plan, the bankruptcy court should not have released MCS's lien.

## A.    The antimodification provision prohibited the Plan from modifying MCS's rights as a homestead mortgagee.

We divide our discussion into three parts. In Section 1, we show why the antimodification provision's text and our precedent require us to conclude that the Plan unlawfully purported to modify MCS's rights as a homestead mortgagee. Section 2 explains how Bozeman improperly used a full-payment plan and why that improper use cannot modify MCS's rights as a homestead mortgagee. And in Section 3, we reject Bozeman's argument that the Supreme Court abrogated our precedent that requires us to conclude that Bozeman's Plan did not modify MCS's rights as a homestead mortgagee.

> 1.    *The statutory text and our prior precedent require us to conclude that, to the extent the Plan purported to modify MCS's rights as a homestead mortgagee, the Plan was not legal under the Bankruptcy Code.*

Because this case requires us to consider what the Bankruptcy Code requires, we begin with the statutory text. *See Heyman v. Cooper*, 31 F.4th 1315, 1318 (11th Cir. 2022) ("As in every statutory-interpretation case, we start with the text—and, if we find it clear, we end there as well.") (citation and quotation marks omitted). In construing the terms of the statute, we give them their

"ordinary public meaning." *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020). Our task requires us to look not only to the statutory language at issue but also to the "language and design of the statute as a whole." *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 167 (2012) (noting that the "whole-text canon . . . calls on the judicial interpreter to consider the entire text, in view of its structure and of the physical and logical relation of its many parts").

The antimodification provision states, as relevant here, that a bankruptcy "plan may—(2) modify the rights of holders of secured claims, *other than a claim secured only by a security interest in real property that is the debtor's principal residence.*" 11 U.S.C. § 1322(b)(2) (emphasis added). In other words, a plan may *not* "modify the rights of holders of . . . a claim secured only by a security interest in real property that is the debtor's principal residence." By its plain language, then, this provision prohibits bankruptcy plans from modifying the rights of the holder of a claim secured by only a security interest in real property that is the debtor's principal residence—rights like MCS's at issue here.

Still, other parts of § 1322 limit this prohibition on modification of homestead mortgage loans. "[N]otwithstanding" § 1322(b)(2), § 1322(b)(5) authorizes bankruptcy plans to "provide for the curing of any default within a reasonable time and *maintenance of payments* while the case is pending on any unsecured claim or secured claim on *which the last payment is due after the date on which the final payment under the plan is due.*" 11 U.S.C.

§ 1322(b)(5) (emphasis added). So for situations when a debtor's outstanding mortgage secured by her principal home is not due to be paid off until after the plan expires, and her payments on that mortgage are in arrears—like Bozeman's situation—a plan may allow the debtor to catch up on her arrearages, while maintaining her monthly payments, and avoid foreclosure. By design, under a plan like that—a cure-and-maintain plan—after the debtor is discharged from bankruptcy, the debtor must continue to make the payments remaining on the original payment schedule for the mortgage. We refer to § 1322(b)(5) as the "cure-and-maintain exception."

By its terms, then, the cure-and-maintain exception authorizes only two things with respect to a principal-residence-backed mortgage when the last payment is due after the plan ends: (1) modification of the rights of the mortgage-holder only as those rights relate to collection of arrears on the debt and (2) maintenance of current payments on the mortgage loan. *Id.* It does not contemplate modification of the mortgage holder's rights to receive payments remaining on the mortgage after the completion of the plan. *See id.*

In contrast—and again "[n]otwithstanding subsection (b)(2) and applicable nonbankruptcy law," § 1322(c)(2)'s text reflects that it deals solely with cases when "the last payment on the original payment schedule for a claim secured only by a security interest in real property that is the debtor's principal residence is due *before the date on which the final payment under the plan is due.*" 11

U.S.C. § 1322(c)(2) (emphasis added). We refer to this exception as the "short-term exception." Under the short-term exception, "the plan may provide for the payment of the claim as modified pursuant to section 1325(a)(5) of this title." *Id.*

Because Bozeman's case does not involve a mortgage where the last payment on the original payment schedule was due before the date on which the final payment under the plan is due, we do not discuss the requirements of the short-term exception further. It is enough to observe that the short-term exception does not authorize an exception to the antimodification provision's prohibition on modifications of a homestead-backed mortgage loan when the original payment schedule contemplates the final payment after the plan period expires.

In sum, then, in § 1322, Congress three times expressly or implicitly protected from modification the rights of homestead-mortgage lenders as they concern those lenders' secured interests in the debtor's principal residence, when the final original payment schedule does not expire before the plan period ends. We have explained that the Code makes these protections because "favorable treatment of residential mortgagees was intended to encourage the flow of capital into the home lending market." *Universal Am. Mortg. Co. v. Bateman* (*In re Bateman*), 331 F.3d 821, 826 (11th Cir. 2003) (quoting *Nobelman v. Am. Savs. Bank*, 508 U.S. 324, 332 (1993) (Stevens, J., concurring) (quotation marks omitted)).

On the other side of the equation, to protect debtors in a relationship with a homestead-mortgagee, the Bankruptcy Code

checks "[t]he lender's power to enforce its rights—and, in particular, its right to foreclose on the property in the event of default"—through the Code's automatic-stay provision. *Id.* (quoting *Nobelman*, 508 U.S. at 330 (quotation marks omitted)).

Consistent with the concern for encouraging homestead mortgages, the Supreme Court has emphasized that, by its terms, § 1322(b)(2) protects "the rights" of homestead-mortgagees, as opposed to "claims." *Nobelman*, 508 U.S. at 328. Towards that end, the Court has explained, § 1322(b)(2) "does not state that a plan may modify 'claims' or that the plan may not modify 'a claim secured only by' a home mortgage. Rather, it focuses on the modification of the '*rights of holders*' of such claims." *Id.*

The Bankruptcy Code does not define the term "rights." *Id.* at 329. But the Supreme Court has instructed courts to look to state law to determine the rights a homestead mortgagee possesses under § 1322(b)(2). *Id.* (citations omitted). Here, MCS's rights are "reflected in the relevant mortgage instruments, which are enforceable under [Alabama] law." *Id.*

MCS and Bozeman signed a promissory note and mortgage that granted MCS a security interest in Bozeman's property. Those instruments gave MCS the right to foreclose on Bozeman's property if Bozeman defaulted on her obligation to make payments to MCS in the agreed-upon amounts. Under the promissory note, Bozeman needed to pay MCS the $14,000 she borrowed plus 19.70% in interest annually. The note proposed 108 monthly payments of $277.67 unless Bozeman exercised her right to pay off her balance

early. And under Alabama law, Bozeman's debt could not be satisfied "until there [was] no outstanding indebtedness or other obligations secured by the mortgage[.]" Ala. Code § 35-10-26. "These are the rights that were 'bargained for by the mortgagor and the mortgagee,' and are rights protected from modification by § 1322(b)(2)." *Nobelman*, 508 U.S. at 329–30 (quoting *Dewsnup v. Timm*, 502 U.S. 410, 417 (1992)).

We have also recognized as much. In *In re Dukes*, we said that "[a] creditor's rights 'protected from modification by § 1322(b)(2)' are the rights under the original loan instruments as defined by state law." *Dukes v. Suncoast Credit Union* (*In re Dukes*), 909 F.3d 1306, 1331 (11th Cir. 2018) (quoting *Nobelman*, 508 U.S. at 329–30).

Despite these rights that the parties bargained for and Alabama law protected, the bankruptcy court deemed MCS's lien in Bozeman's residence to be satisfied and released. It did so even though Bozeman paid MCS only the $6,817.42 in arrearages and has yet to pay the remaining balance. But both Supreme Court and our precedent require us to conclude that declaring a homestead-mortgagee's lien satisfied before the debt the lien secures is paid in full constitutes an impermissible modification of the homestead-mortgagee's rights under the antimodification provision.

We begin with *Nobelman*. There, the Supreme Court considered the debtors' attempt to void the portion of their creditor's lien that exceeded the value of the partially underwater home the lien secured. *Nobelman*, 508 U.S. at 325–26. The debtors relied on

11 U.S.C. § 506(a) to argue that the homestead mortgagee's claim was secured up to only the current value of the home, and the remainder of the claim was unsecured. *Id.* at 328. They asserted that the antimodification provision protects only "holders of secured claims," and the creditor held a secured claim only to the extent of the home's value. *Id.*

The Supreme Court disagreed. The Court concluded that the debtors' argument "fail[ed] to take adequate account of § 1322(b)(2)'s focus on 'rights.'" *Id.* at 328. The antimodification provision did not prohibit the modification of "claims"; rather, it prohibited the modification of "'*the rights of holders*' of such claims," the Court explained. *Id.* And state law and the underlying mortgage instruments revealed that the creditor possessed the right to, among other things, retain its lien until its debt was paid off. *Id.* at 329. So, the Court held, bifurcating the creditor's claim, and thus partially stripping its lien, would constitute a modification of its rights in violation of the antimodification provision. *Id.* at 331.

Here, the problem is worse than that. The bankruptcy court's order did not just release MCS's lien in part; it released it in full. Even though MCS had a secured interest in Bozeman's home, MCS has received payment for only the arrearages that were included in its claim. So release of MCS's lien would cause the remainder of its interest to simply evaporate, regardless of its substantive rights under the terms of the mortgage and Alabama law. Because Bozeman obtained the release before she repaid MCS under the terms of the contract, we must conclude that the order

granting the release unlawfully modified MCS's rights as a secured homestead-mortgagee.[9]

Our decisions in *Bateman* and *Dukes* further compel this result. In *Bateman*, the debtor's plan provided for only partial payment in arrears to her primary-residence mortgage creditor (a plan that the bankruptcy court confirmed without objection). 331 F.3d at 822–23. We held that the bankruptcy court could not discharge the debtor from the full amount of the arrears she in fact owed. *Id.* at 834. We rooted our decision "within the context of the special treatment afforded mortgage lenders" under the antimodification provision. *Id.* at 825 n.4. As we explained, the debtor's "plan is prohibited from reducing the mortgagee's secured claim." *Id.* at 826. In other words, we reasoned that even though the debtor's plan had been confirmed, the antimodification provision prohibited modifications to the mortgagee's rights that the debtor's primary residence secured. As a result, we concluded that the creditor's "secured claim for arrearage survive[d] the [p]lan and [the creditor] retain[ed] its rights under the mortgage until [its] claim [was] satisfied in full." *Id.* at 834. Allowing the confirmed plan to extinguish the mortgagee's rights "would deny the effect of" the antimodification provision, we said. *Id.* at 822.

---

[9] *Bateman* and *Dukes*, which we will discuss further, foreclose the Trustee's suggestion that the term "modification" refers to only the bifurcation of a secured claim into a secured and unsecured portion. In both cases, we concluded that discharging liability for unpaid debts constituted a modification of rights under § 1322(b)(2). And neither case involved bifurcating claims.

Also in *Bateman*, we cited with approval the Fifth Circuit's decision in *Simmons v. Savell* (*In re Simmons*), 765 F.2d 547 (5th Cir. 1985). There, the debtor's plan had inaccurately characterized the creditor's claim. 765 F.2d at 549. The Fifth Circuit rejected the debtor's argument that the inaccurate characterization effectively "lift[ed] the construction lien from the homestead and vest[ed] the interest of the property in the debtor 'free and clear of any claim or interest of any creditor.'" *Bateman*, 331 F.3d at 831 (quoting *Simmons*, 765 F.2d at 555). Instead, the Fifth Circuit held the creditor's lien on the debtor's homestead "remained unimpaired by the order of confirmation." *Id.* (quoting *Simmons*, 765 F.2d at 559). So we explained in *Bateman* that, under *Simmons*, "a lien on a mortgage survives the § 1327 *res judicata* effect of a confirmed plan." *Id.*

We reached a similar conclusion in *Dukes*. There, we held that even if the debtor's plan "provided for" her mortgage, we could not discharge the debt she owed because doing so would violate the antimodification provision. *Dukes*, 909 F.3d at 1320. As we explained, "a discharge of a debtor's obligations under his residential mortgage would dramatically modify the rights of the holder of that mortgage." *Id.* The debtor argued that discharge was not a modification because the creditor could still foreclose on the property, even if it could not seek a deficiency judgment against the debtor. *Id.* at 1320–21. We rejected that argument. In so doing, we reasoned that "[r]emoval of the [creditor's] right to pursue *in personam* liability against [d]ebtor" would "strip[] the [creditor] of a right provided by the original loan instrument." *Id.* at 1321.

The proposed discharge therefore "would necessarily modify the [creditor's] rights" in violation of the antimodification provision. *Id.*

The reasoning in *Dukes* applies with additional force here. Releasing a mortgagee's lien would modify its rights even more dramatically than discharging the debtor's obligations under the mortgage. After all, regardless of whether a mortgagee can seek *in personam* relief against a debtor, a mortgagee that retains its lien can use that lien "to collect future obligations" through an *in rem* proceeding against the property. *Dukes*, 909 F.3d at 1322. But if MCS's lien is released here, MCS would have no mechanism to collect the remaining balance.

The Code's protections for the rights of primary-residential mortgage holders forbid that result. So they prohibit releasing a lien before the terms of the primary-residential mortgage are satisfied. Indeed, the Supreme Court has long recognized the protection bankruptcy law offers against the invalidation of a creditor's lien. *See Dewsnup*, 502 U.S. at 418–19 ("[N]o provision of the pre-Code statute permitted involuntary reduction of the amount of a creditor's lien for any reason other than payment on the debt.") (citing *Long v. Bullard*, 117 U.S. 617, 620–621 (1886)).[10]

_____

[10] This is not to say that the modern Bankruptcy Code completely lacks the authority to strip or void liens or that liens always survive bankruptcy. *See, e.g., Wells Fargo Bank, N.A. v. Scantling* (*In re Scantling*), 754 F.3d 1323, 1325 (11th Cir. 2014) (holding that the Bankruptcy Code authorizes "a debtor [to] 'strip off' a wholly unsecured junior mortgage in a Chapter 20 case."). In fact,

Bozeman resists the conclusion that releasing MCS's lien violates the antimodification provision. She asserts that her Plan contemplated paying MCS's entire claim, so her payments through the Plan amounted to early payment of the full balance owed to MCS, and they satisfy the full scope of her obligations. But Bozeman's position does not square with controlling legal authority. Both the text of the statute and *Nobelman* instruct that the critical inquiry for the antimodification provision involves the *"rights* of holders." *Nobelman*, 508 U.S. at 328 (quoting 11 U.S.C. § 1322(b)(2)).

So while it's true that the sole timely proof of claim that MCS filed during the bankruptcy proceeding sought only $6,817.42 in arrears, nothing about that claim (or the absence of any additional claim) changed the fact that MCS was entitled under the terms of the mortgage and Alabama law to receive full payment on the balance of its loan. In fact, our precedent is clear that a secured creditor is not required to file a claim at all, as "it will always be able to look to the underlying collateral to satisfy its lien." *Bateman*, 331 F.3d at 827. So we are not persuaded that MCS's arrearages-only claim changed the nature of its rights. Even though Bozeman paid MCS's full arrearages claim through the Plan, MCS retains the *right* to receive the entire balance. The Code precludes

---

in *Dewsnup*, the Supreme Court recognized historical precedent for modifying a creditor's lien in "reorganization proceedings." *Dewsnup*, 502 U.S. at 418–19. But we are talking here about a primary-residential mortgage holder's lien, which, as we've noted, is a right subject to the antimodification provision.

the Plan from modifying the amount that MCS was entitled to under the primary residential mortgage.

    2.    *Bozeman's full-payment Plan cannot modify MCS's rights.*

Bozeman insists that *Bateman* and *Dukes* have no bearing on the outcome here because they both concerned cure-and-maintain plans whereas Bozeman proceeded under a full-payment plan. We disagree. In fact, Bozeman's use of a full-payment plan further confirms that a release of MCS's lien is improper. To explain why, we begin with the text and then discuss *Bateman* and *Dukes* specifically.

Chapter 13 permits debtors to structure their plans as a cure-and-maintain plan or a full-payment plan. As we've noted, a cure-and-maintain plan allows a debtor to pay off her arrearages and make separate monthly payments on her mortgage so she can avoid foreclosure. *Green Tree Acceptance, Inc. v. Hoggle* (*In re Hoggle*), 12 F.3d 1008, 1010 (11th Cir. 1994). In a full-payment plan, by contrast, a debtor can combine the arrearages she owes with the full outstanding balance of the loan to create a single monthly payment. *See* 11 U.S.C. § 1325(a)(5)(B). That way, after the debtor has made all her payments under the plan, she will have paid off the entire loan and satisfied the full amount of her obligation.

Here, Bozeman unambiguously elected to structure her Plan as a full-payment plan. And the Code supports her right to do

so, as cure-and-maintain plans are a permissible, but not manda-tory, mechanism to structure long-term debt. *In re Chappell*, 984 F.2d 775, 780 (7th Cir. 1993).[11]  But whatever the structure of her plan, the antimodification provision forbids modification of MCS's substantive rights.  11 U.S.C. § 1322(b)(2).  Therefore, absent an exception to the antimodification provision, Bozeman's Plan could not modify MCS's right to receive the full loan balance before MCS's lien is released.

And here, no exception authorized Bozeman's Plan's at-tempt to modify MCS's right to receive the remaining balance on the primary-residential mortgage before MCS's lien could be re-leased.  Bozeman has identified no permissible exception, and the text of the Bankruptcy Code and precedent preclude our finding any.

That is so because *Nobelman* suggests that we must find any exception to the antimodification provision in the Code's text.  In *Nobelman*, for example, the Supreme Court "recognize[d] two in-stances in which the antimodification provision of § 1322(b)(2) does not apply."  *Dukes*, 909 F.3d at 1321.  One includes § 1322(b)(5)'s authorization of cure-and-maintain plans, which are "expressly exempted from the antimodification provision."  *Id.* (cit-ing *Nobelman*, 508 U.S. at 330).  Another is § 362's automatic-stay provision, which "does not alter future rights or obligations."  *Id.*

---

[11] "[T]he most common use by far" of cure-and-maintain plans "is to cure de-faults on residential mortgages."  8 Collier on Bankruptcy ¶ 1322.09[2].

(citing *Nobelman*, 508 U.S. at 330).  In other words, Congress has seen fit to create certain exceptions to the antimodification provision.  But absent such a directive in the Code, the antimodification provision applies with full force.[12]

Turning to the situation in Bozeman's case, we must conclude that no statutory exception spares a full-payment plan from the antimodification provision.  Without an exception that the text authorizes, the antimodification provision controls.  And it dictates that full-payment plans may not modify homestead-mortgage holders' rights.  So while Bozeman did have the option to structure her Plan as a full-payment plan instead of a cure-and-maintain plan, she could not use that full-payment plan to release MCS's lien before MCS had received the entire benefit of its bargain.

As we've explained, our decisions in *Bateman* and *Dukes* confirm the protections that the antimodification provision requires be afforded to mortgage-holders' rights.

As an initial matter, neither *Bateman* nor *Dukes* purports to cabin its reasoning to cases involving cure-and-maintain plans.  And both cases held that the underlying bankruptcy plans would improperly modify the secured creditors' rights if the liens were released before the entire balances were paid.  *Bateman*, 331 F.3d at

_____

[12] We have also recognized an additional express exception to the antimodification provision in § 1322(c)'s short-term exception.  *Am. Gen. Fin., Inc. v. Paschen* (*In re Paschen*), 296 F.3d 1203, 1207 (11th Cir. 2002).  But as we explained earlier, *see supra* at 15–16, § 1322(c) does not apply here.

832; *Dukes*, 909 F.3d at 1320.  If that is true in the context of cure-and-maintain plans, it must also be true in the context of full-payment plans.  After all, no statutory basis authorizes full-payment plans to provide fewer protections to homestead mortgage holders' rights than cure-and-maintain plans offer.[13]  Nor are we aware of any statutory basis upon which full-payment plans can impose any modification on mortgage holder's rights without their express agreement.

The Trustee argues that the factual distinction between cure-and-maintain plans and full-payment plans is "critical" because mortgage liens will always survive a cure-and-maintain plan, but a full-payment plan is designed to discharge all debts provided for in the plan.  This misses the point.  That a full-payment plan is designed to discharge all debts provided for in the plan does not change the fact that the antimodification provision precludes the modification of the homestead mortgage holder's rights.  Nor does our decision prevent a debtor from using a full-payment plan to pay off her full mortgage balance, discharge her debt, and satisfy the corresponding lien.  But to do so, the debtor must, in fact, use her full-payment plan to pay the full balance she owes.

---

[13] If anything, full-payment plans provide more protections to homestead mortgagees' rights than cure-and-maintain plans since cure-and-maintain plans arise under § 1322(b)(5), which is "expressly exempted from the antimodification provision."  *Dukes*, 909 F.3d at 1321.

Bozeman seemingly knew this—her Plan proposed paying MCS $17,393.04 plus interest. But because of MCS's arrearages-only claim, Bozeman sought to satisfy the full scope of her obligation by paying only those arrearages and ignoring the remaining balance owed to MCS.  But this maneuver purports to modify MCS's right to receive full payment before its lien is released, so the antimodification provision forbids it.  If Bozeman had, in fact, used her full-payment plan to pay off the full balance she owed, releasing MCS's lien at this stage would be entirely appropriate.

In sum, Bozeman's use of a full-payment plan instead of a cure-and-maintain plan does not alter our conclusion that her Plan purports to improperly modify MCS's rights in violation of § 1322(b)(2).

### 3.    *Espinosa* did not abrogate *Bateman*.

Bozeman also argues that *Bateman* should not control here because, in her view, the Supreme Court's decision in *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260 (2010), "displaced the rationale in *Bateman*, to the extent that when a creditor has notice that a plan proposes to modify the rights of a creditor and the creditor fails to object to confirmation or timely appeal, the confirmed plan remains enforceable and binding on the creditor." Appellee's Br. at 10 (citing *Espinosa*, 559 U.S. at 275).  We disagree.

In *Espinosa*, a debtor sought to discharge the interest that had accrued on his student-loan debt.  He did so even though he did not show "undue hardship" in an adversary proceeding—a

showing required to discharge certain student-loan debts. 559 U.S. at 263–64 (citing 11 U.S.C. §§ 523(a)(8), 1328; Fed. R. Bankr. P. 7001(6)). The student-loan creditor received notice of the plan but did not object based on the debtor's failure to show undue hardship or initiate an adversary proceeding. *Id.* at 265. And the bankruptcy court confirmed the debtor's plan. *Id.* After the debtor completed payments on the principal he owed, the court discharged the accrued interest due the creditor. *Id.* at 265–66. Six years after the debt had been discharged (and ten years after the initial confirmation), the student-loan creditor filed a motion under Federal Rule of Civil Procedure 60(b)(4) seeking to set aside as void the bankruptcy court's order confirming the plan. *Id.* at 266.

The Supreme Court held the bankruptcy court's confirmation order was not "void" under Rule 60(b)(4). It explained that "[a] judgment is not void . . . simply because it is or may have been erroneous," and a Rule 60(b)(4) motion "is not a substitute for a timely appeal." *Id.* at 270 (citations omitted). Instead, *Espinosa* held that Rule 60(b)(4) applies only when an error that affects jurisdiction or that affects due process by depriving parties of notice occurs. *Id.* at 271.

As we explain below, *Espinosa* has no bearing on the release of a lien after a confirmed plan erroneously modifies a homestead-mortgagee's rights. And we do not read *Espinosa* as having abrogated *Bateman* for five reasons.

First, the Supreme Court expressly limited *Espinosa*'s holding to collateral challenges to confirmed Chapter 13 plans under

Federal Rule of Civil Procedure 60(b)(4). *Espinosa*, 559 U.S. at 269 n.8 ("We express no view on the terms upon which other provisions of the Bankruptcy Rules may entitle a debtor or creditor to postjudgment relief.").[14]  Bozeman's case does not arise in the context of a Rule 60(b)(4) motion, and that is an important difference for two reasons:  (1) as we've noted, *Espinosa* expressly does not apply outside the Rule 60(b)(4) context; and (2) the practical difference between the procedural posture of a Rule 60(b)(4) motion and the situation in *Bateman* renders *Espinosa*'s reasoning inapplicable to the *Bateman* situation.

We explain what we mean by this second reason in our second point:  *Bateman* emerged in a significantly different procedural posture than *Espinosa*.  In *Espinosa*, the creditor brought its Rule 60(b)(4) motion challenging the discharge order ten years after the debtor's plan had been confirmed and six years after his debt had been discharged.  *Espinosa*, 559 U.S. at 265–66.  In *Bateman*, by contrast, the creditor brought its challenge after plan confirmation but *before* the underlying debt had been discharged.  *See Bateman*, 331 F.3d at 823.  So though the challenge was collateral in one sense

---

[14] In *In re Le Centre on Fourth, LLC*, we applied *Espinosa* to a bankruptcy dispute emerging outside the Rule 60(b) context.  *See Jackson v. LeCentre on Fourth, LLC* (*In re Le Centre on Fourth, LLC*), 17 F.4th 1326, 1334 (11th Cir. 2021).  But in *Le Centre*, we relied on *Espinosa* for its holding concerning the notice due a creditor to satisfy due process.  *Id.* (discussing *Espinosa*, 559 U.S. at 272).  We did not consider or address *Espinosa*'s impact, if any, on the anti-modification provision.

(as it related to the lawfulness of the plan), it was not in another (as it related to the amount of the debt to be discharged upon completion of the plan). The same is true here: though MCS did not object to Bozeman's plan before confirmation, it timely objected to and appealed the bankruptcy court's decision to release its lien. And unlike the creditor in *Espinosa*, MCS did not bring its challenge years after the fact under Rule 60(b)(4).

Third, a fair reading of *Espinosa* confirms that the Court was primarily concerned with the meaning of a "void" judgment under Rule 60(b)(4). The Court held that a judgment is "void" under that provision "only in the rare instance where a judgment is premised either on a certain type of jurisdictional error or on a violation of due process that deprives a party of notice or the opportunity to be heard." 559 U.S. at 271. *Espinosa* went on to explain that neither such circumstance applied in that case, and it rejected the creditor's arguments urging the Court to "expand the universe of judgment defects that support Rule 60(b)(4) relief." *Id.* at 273. Even though the Court agreed with the creditor that the bankruptcy court made a legal error, the Court held that the error did not "render [the bankruptcy court's] subsequent confirmation order void for purposes of Rule 60(b)(4)." *Id.* at 274. So at every opportunity, *Espinosa* discussed its holding in the context of Rule 60(b)(4) and the meaning of "void." In short, the opinion did not purport to decide

more than the appropriate scope of Rule 60(b)(4) and the meaning of "void" when it discussed the effect of a confirmed plan.[15]

Fourth, our decision in *Bateman* did not rest on the premise that the plan there was unlawfully confirmed, and therefore, ripe for collateral attack. In fact, we specifically rejected that suggestion. *See Bateman*, 331 F.3d at 825 n.4 ("[W]hether the [p]lan was confirmed in violation of § 1322 or § 1325 is irrelevant to the disposition of this case, because the *res judicata* effect of § 1327 prohibits the collateral attack of a confirmed plan.") (citation omitted). We went as far as to address and reject the creditor's argument "that because the [p]lan did not meet the requisites of § 1325 . . . the [p]lan cannot be afforded *res judicata* effect under § 1327." *Id.* at 829. We even acknowledged that the "[p]lan was improperly confirmed because it conflicted with § 1322's mandatory provisions," and noted that "[h]ad [the creditor] objected to or appealed from the [p]lan's confirmation, it would have prevailed without question, given the facts presented to us." *Id.* at 830. Still, we held that because the creditor "did not do so," it remained bound by § 1327. *Id.* In this sense, *Bateman* and *Espinosa* are at peace with each other (and with our decision here) in their recognition that

---

[15] Following its discussion of Rule 60(b)(4), *Espinosa* also considered the statutory requirements for confirming a plan that discharges student-loan debt. 559 U.S. at 276–78 (discussing 11 U.S.C. §§ 523(a)(8), 1328(a)(2)). Neither this case nor *Bateman* involves § 523(a)(8) or § 1328(a)(2), so we do not address *Espinosa*'s impact on the interpretation of those provisions.

confirmed bankruptcy plans are immune from collateral attack, even if they were erroneously confirmed.

Fifth, our decision in *Dukes* reaffirmed our holding in *Bateman* to prohibit discharge of homestead-mortgage debt if doing so would modify a creditor's rights in violation of the antimodification provision—even though the plan erroneously provided for the discharge. *Dukes*, 909 F.3d at 1321 (citing *Bateman*, 331 F.3d at 822); *see also Hope v. Acorn Fin., Inc.*, 731 F.3d 1189, 1194 (11th Cir. 2013) (relying on *Bateman* after *Espinosa*). Because we decided *Dukes* after the Supreme Court issued *Espinosa*, even if we thought *Espinosa* compelled a different outcome, we would still be bound by *Dukes*. *See Keohane v. Fla. Dep't of Corr. Sec'y*, 981 F.3d 994, 1005 (11th Cir. 2020) (Rosenbaum, J., dissenting from the denial of rehearing en banc) ("[W]e have held that the prior-precedent rule binds later panels even when the prior panel's decision failed to mention controlling Supreme Court precedent and reached a holding in conflict with that precedent.") (citing *Smith v. GTE Corp.*, 236 F.3d 1292, 1302–03 (11th Cir. 2001)).

At bottom, we are convinced that our decision in *Bateman* remains intact after the Supreme Court's decision in *Espinosa*. And as we explained earlier, *Bateman* requires us to conclude that releasing MCS's lien would improperly modify its rights and therefore violate § 1322(b)(2).

**B.**  **The finality provision does not override the antimodification provision to allow for the release of MCS's lien after the bankruptcy court's confirmation of Bozeman's unlawful Plan.**

MCS's challenge also raises the question of whether the *res judicata* effect of the confirmation order requires release of MCS's lien.  We hold it does not.

The Bankruptcy Code makes clear that confirmation of a plan carries real weight.  Specifically, the Code mandates that "[t]he provisions of a confirmed plan bind the debtor and each creditor, whether or not the claim of such creditor is provided for by the plan, and whether or not such creditor has objected to, has accepted, or has rejected the plan."  11 U.S.C. § 1327(a).  The upshot of this provision is "[c]onfirmation has preclusive effect, foreclosing relitigation of any issue actually litigated by the parties and any issue necessarily determined by the confirmation order."  *Bullard v. Blue Hills Bank*, 575 U.S. 496, 502 (2015) (citation omitted).

We have also explained that "[p]reclusion under § 1327 is somewhat harsher than common law preclusion" and that a confirmed plan "is given the same effect as any district court's final judgment on the merits."  *Bateman*, 331 F.3d at 830; *Wallis v. Justice Oaks II, Ltd.* (*In re Justice Oaks II, Ltd.*), 898 F.2d 1544, 1550 (11th Cir. 1990).  A confirmed plan has this effect "even if the plan does not, by its terms, comply with the Bankruptcy Code."  *Hope*, 731 F.3d at 1194.

As we have explained, the Plan at issue here violated the an-timodification provision. So it should not have been confirmed. As a reminder, the Plan impermissibly allowed Bozeman to pay only MCS's arrearages claim and ignore the remaining balance Bozeman owed on her mortgage. But despite this error, because of the Code's finality provision, Bozeman's Plan retains preclusive effect and is therefore valid and enforceable.

We explored the importance of finality of confirmed plans in *Bateman*. There, although the creditor failed to object to a legally erroneous plan, it later filed a motion to dismiss the bankruptcy proceeding because the plan never should have been confirmed. 331 F.3d at 833. Though we agreed the plan should not have been confirmed, we rejected the argument that the bankruptcy proceeding should be dismissed for that reason. *Id.* We noted that the creditor had several opportunities to raise its objections to the plan before the plan was confirmed and obtained preclusive effect. *Id.* And we expressed concern that the prejudice associated with unwinding the plan "would far exceed the possible benefit." *Id.*

For largely the same reasons, MCS cannot now complain about infirmities with the Plan. MCS had ample opportunity to participate in the underlying proceeding and file a timely amended claim with the full balance it was owed. MCS also could have objected to the Plan's confirmation and argued that the Plan impermissibly modified its rights. And MCS should have noticed, far earlier than it did, that Bozeman's Plan was structured as a full-

payment plan rather than a cure-and-maintain plan. Not only did the Plan, by its own terms, indicate that it was a full-payment plan, but also MCS received only one monthly payment from Bozeman (as it would under a full-payment plan) rather than two monthly payments (as it would under a cure-and-maintain plan). Plus, the amount of that monthly payment did not equal the $454.00 monthly payment that the Plan seemingly noted MCS was due.

But MCS's errors do not change the fact that the Code still affords special protections to homestead-mortgage holders' rights. So even though our cases have recognized the importance of finality, they have also said time and again that secured liens survive bankruptcy proceedings. *Holloway v. John Hancock Mut. Life Ins. Co.* (*In re Holloway*), 81 F.3d 1062, 1063 n.1 (11th Cir. 1996) ("[D]ischarges in bankruptcy do not affect liability in rem. Thus, liens on property remain enforceable after discharge unless avoidable under the Bankruptcy Code."). In *Bateman*, for example, we held that the creditor's secured lien "is unaffected by the Plan and survives the bankruptcy unimpaired." 331 F.3d at 832. This conclusion flowed naturally from the overarching principle that "a secured creditor need not do anything during the course of the bankruptcy proceeding because it will always be able to look to the underlying collateral to satisfy its lien."[16] *Id.* at 827.

---

[16] We relied on the lien's survival to demonstrate that the creditor will not face significant prejudice from the erroneously confirmed plan, nor will the debtor receive an unwarranted windfall. *Bateman*, 331 F.3d at 833.

We also reached a similar conclusion in *In re Thomas*, in which we held the creditor retained its lien on a mobile home even though the debtor's interest was discharged through bankruptcy. *Southtrust Bank of Ala., N.A. v. Thomas* (*In re Thomas*), 883 F.2d 991, 997 (11th Cir. 1990). And in *Dukes*, we suggested in dicta that, because of the antimodification provision, a creditor's mortgage would "pass[] through the bankruptcy unaffected even though no proof of claim was filed." 909 F.3d at 1322; *see also SEC v. Wells Fargo Bank, N.A.*, 848 F.3d 1339, 1344 (11th Cir. 2017) ("In the bankruptcy context, a secured creditor's lien remains intact through the bankruptcy, regardless of whether the creditor files a proof of claim.").

Under our case law, then, we must hold that MCS's lien survived Bozeman's bankruptcy. Based on the terms of the mortgage and Alabama law, MCS had the substantive right to collect the full balance it lent to Bozeman as well as the right to hold its lien on the property as collateral until the debt had been paid. And under the antimodification provision, Bozeman's Plan could not legally modify those rights.

Although MCS did not timely object to the Plan's confirmation or appeal the discharge of Bozeman's debt, MCS did oppose Bozeman's motion to release its lien, and it timely appealed the bankruptcy court's order granting her motion. And because releasing MCS's lien before MCS receives full payment would impermissibly modify MCS's rights, MCS's lien must survive the bankruptcy proceeding. While the finality provision confirms that it is too late

to alter the Plan, it is not too late for MCS to invoke the Code's special protection for homestead mortgagees.

Our decision here follows directly from *Bateman*. In that case, we acknowledged that the creditor should have raised its challenges earlier and that, if it had, the erroneous plan would not have been confirmed. 331 F.3d at 833. And the creditor's failure carried consequences, as we rejected the creditor's motion to dismiss the debtor's plan, holding that the plan remained valid and enforceable. *Id.* Still, though, we held that the creditor's secured claim could not be satisfied until the debtor paid the entire claim amount because "to permit otherwise would deny the effect of 11 U.S.C. § 1322(b)(2), which, in effect, prohibits modifications of secured claims for mortgages on a debtor's principal residence." *Id.* at 822.

The same is true here. MCS should have raised its challenges earlier, and it could have prevented confirmation of Bozeman's Plan. But we cannot hold that MCS's lien on the property can be deemed satisfied because the antimodification provision protects MCS's right to receive full recovery, regardless, and MCS has raised a timely challenge to the order releasing its lien.[17]

## IV.

We hold that release of MCS's lien before its loan had been repaid in full violates § 1322(b)(2)'s antimodification clause. Until

---

[17] Our opinion expressly does not consider a case in which a creditor belatedly seeks relief from an order releasing its lien.

MCS is paid in full, its lien remains intact, and the Bankruptcy Code's finality provision does not change that fact.[18]

**REVERSED AND REMANDED.**

---

[18] Because MCS did not appeal the bankruptcy court's decision to discharge Bozeman from bankruptcy, we do not consider or disturb that decision.